HAROLD BROWN AND CARYN MATCHINGA BROWN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown v. Commissioner
Docket No. 16331-84.
United States Tax Court
T.C. Memo 1988-527; 1988 Tax Ct. Memo LEXIS 557; 56 T.C.M. (CCH) 638; T.C.M. (RIA) 88527; November 14, 1988. Jerome R. Rosenberg and Robert A. Sternbach, for the petitioners. Moira L. Sullivan, Mildred M. Moon, and Mitchell B. Hausman, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Taxable Year
Deficiency
1975
$  3,332.00
1978
$ 37,975.00
1979
$ 66,773.58
1980
$ 23,778.76
By amendment to his answer, respondent further asserted that the entire underpayments of taxes for the 1979 and 1980 years were substantial underpayments attributable to tax motivated transactions so that petitioners are liable for increased interest pursuant to section 6621(c). [1]
*560 After settlement by the parties of certain issues, including all issues relating to the 1975 and 1978 tax years, the deficiencies still in dispute arise in regard to a limited partnership interest in Somerset Associates ("Somerset"). The issues for decision are (1) whether petitioners are entitled to deductions in 1979 and 1980 and an investment credit from a distributive share in Somerset and, if so, in what amounts; and (2) whether petitioners are liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT A few of the facts have been stipulated. [2] The stipulated facts and exhibits are incorporated herein by this reference. *561 Petitioners resided in Los Angeles, California, at the time they filed their petition. During the years in issue, petitioner Harold Brown was an executive with American International Television Inc., and petitioner Caryn Matchinga Brown was an actress. Setting the Stage
Somerset, originally named Dark Associates, was formed as a limited partnership under New York law on or about June 1, 1978. Somerset was organized "to acquire and exploit video tapes, motion pictures and motion picture rights." Somerset's general partners were Daniel Glass and Stephen W. Sharmat. Messrs. Glass and Sharmat both have experience in the entertainment industry. Mr. Glass is a graduate of Harvard Law School and has been a practicing attorney for many years. He began his legal career at a law firm that was involved in all activities relating to the entertainment field, particularly motion pictures and television. Mr. Glass later became general counsel and business manager for the television subsidiary of Columbia Pictures, which then was known as Screen Gems. At Screen Gems, he negotiated for the purchase and distribution of motion picture rights, and he supervised the drafting of documents *562 prepared for those transactions. Since about 1961, Mr. Glass has been a partner in the law firm of Migdal, Tenney, Glass & Pollack ("Mr. Glass' law firm"), where he practices entertainment law. In all matters relating to Somerset, Mr. Glass or Edmund Rosenkrantz, one of his law partners, represented Somerset. Mr. Sharmat also has been engaged in the entertainment field for several years, having produced plays and motion pictures and arranged financing for many motion pictures. Mr. Sharmat has been a lecturer in the Department of Theatre and Speech at Manhattan Community College and at the University of California at Los Angeles. Messrs. Sharmat and Glass have been general partners or organizers of several other partnerships that have financed or purchased interests in motion pictures, and several of those investments and motion pictures were financially successful. "STEEL" -- The Movie
Somerset's only activities related to its rights in a motion picture entitled "Steel" (hereinafter STEEL). The Private Placement Memorandum for Somerset described STEEL as an action-adventure picture depicting the successful efforts of a tough group of professional steeplejacks recruited *563 and led by Lee Majors to "top-out" the steel framework of a high-rise building within a tight deadline in the face of many hazards and obstacles both natural and man-made (such as wildcat strikes and sabotage) by those who would profit if the deadline were not met. The movie was based on a screenplay written by Leigh Chapman, and it was directed by Steve Carver and produced by Peter S. Davis and William N. Panzer. The star of STEEL was Lee Majors, who was in his first leading role in a film, but who was married to Farrah Fawcett-Majors and had been featured in several television movies and series, including "The Six Million Dollar Man" and "The Big Valley." STEEL also featured Jennifer O'Neill, a one-time internationally-known model whose film credits included "Summer of '42," "The Reincarnation of Peter Proud," and "Cloud Dancer;" George Kennedy, an Academy Award winner for his performance in "Cool Hand Luke" who also had been featured in other films such as "The Dirty Dozen" and "Airport;" and Art Carney, who had won an Oscar for his role in "Harry and Tonto" and had appeared for almost twenty years in various television shows, including "The Honeymooners" with Jackie Gleason. *564 Steel Productions, Inc. ("Steel Productions") was an entity wholly owned by Peter Davis and William Panzer, and served as the producer of STEEL. In July of 1978, Steel Productions entered into an agreement with The Steel Company ("Steel LP"), whereby Steel LP agreed to finance and distribute, or cause to be distributed, the motion picture, which at that time had a budgeted negative cost (i.e., cost of production) of $ 3,672,960. In exchange for the transfer of its rights in STEEL, Steel Productions was to receive a deferred production fee of $ 150,000 from Steel LP, as well as 31.5 percent of the "Net Profits of the Picture" received by Steel LP, as that term was defined in the Steel LP limited partnership agreement. [3] Steel LP was a California limited partnership whose general partner was Davis/Panzer Productions, Inc., a corporation represented by Peter Davis. The limited partners of Steel LP were Lee Majors and New Line Development, Inc. ("New Line"). [4]
*565 The initial capital contributions and sharing of profits and losses for Steel LP were as follows: Davis/Panzer Productions, Inc.
$ 825,296
17.391%
New Line
200,000
10.435 Lee Majors
775,000
72.174 1,800,296
100.000 The limited partnership agreement also provided that all investment tax credit ("ITC") applicable to STEEL would be allocated 5/7 to Lee Majors and 2/7 to New Line. Peter Davis was a 1966 cum laude graduate of Columbia Law School who had practiced law from 1966 until 1975. During the period in which he was producing STEEL and organizing Steel LP, Mr. Davis has been under indictment since 1976 in Federal District Court in New York on charges relating to the preparation and distribution of a fraudulent proxy statement. On February 28, 1980, a verdict was entered against Mr. Davis, reflecting his pleas of guilty to knowingly making false and misleading statements in a proxy statement of a publicly held company, and to conspiring to violate Federal mail fraud statutes and Federal securities rules and regulations. Mr. Davis was fined $ 5,000 and given no incarceration or period of probation for those offenses, and the government consented *566 to dismissal of three other charges against him. On account of his involvement with the false proxy statements, Mr. Davis was barred for life from practicing before the Securities and Exchange Commission in securities matters. Mr. Davis also was suspended from the practice of law in New York for the two-year period beginning on September 4, 1980. In an agreement made as of June 9, 1978, [5] Steel LP granted the National Broadcasting Company, Inc. ("NBC"), the right to telecast STEEL for two runs. The agreement required NBC to pay Steel LP $ 1,200,000 -- 10 percent upon execution of the agreement "and receipt by NBC of a guaranty from a third party that the picture [would] be completed;" 60 percent within 10 days of the first run of STEEL but no later than 18 months after the commencement of the telecast term; and 30 percent within 10 days after the second run of STEEL or the end of the telecast term, whichever was earlier. The first payment from NBC, in the amount of $ 120,000, was used to finance production of STEEL. *567 By an agreement dated June 7, 1978, Steel LP granted to Time Life Films, Inc. ("TimeLife") "the sole and exclusive television rights including free and pay rights in the film subject only to the [rights granted to NBC]." The rights were granted to TimeLife for 28 years. The agreement provided that TimeLife was to pay Steel LP (1) an outright payment for pay television rights of $ 225,000 (subject to escalation if U.S. theatrical rentals exceeded $ 5 million) and (2) staggered advances totalling $ 450,000 against Steel LP's share of gross receipts from free television rights. [6] In exchange for its distribution services for STEEL, TimeLife would retain 35% of United States gross receipts and 40% of non-U.S. gross receipts from free television; however, TimeLife was entitled to retain all receipts from pay television distribution. The agreement was amended in June 1980 to provide that the $ 450,000 advance was to be paid by TimeLife over a longer period, and that references *568 to the term "pay television" were to be amended to "non-standard television," which was defined as "any and all forms of television exhibition and display * * * other than exhibitions by a VHF or UHF television station." The amended agreement also provided that TimeLife would pay Steel LP an additional $ 125,000 for non-standard television rights if a major distributor, namely, Columbia Pictures, Paramount Pictures, Universal Pictures, United Artists, Twentieth Century Fox, or Warner Brothers, were the initial distributor for the general U.S. theatrical release of STEEL. In a credit agreement dated July 14, 1978, Chemical Bank agreed to loan Steel LP up to $ 1,775,000. According to the credit agreement, a $ 3,675,000 budget for STEEL was to be funded as follows: Source
Amount
Contributions and loans from Steel LP partners
$ 1,800,296
First installment of NBC license fee
120,000
Chemical Bank loans
1,755,000
$ 3,675,296
In exchange for making the loan, Chemical Bank received a security interest in all assets relating to the film and of Steel LP, as well as personal guaranties of the obligation from Peter Davis and William Panzer. On July 17, 1978, Steel *569 LP granted New Line, for a ten-year period, distribution rights for STEEL worldwide, except for the United States (and in certain circumstances Canada) and subject to certain provisions in the TimeLife agreement regarding foreign television rights. In exchange for its distribution services, New Line was to retain 25 percent of the first $ 1 million of receipts and 15 percent thereafter. New Line, along with NBC and Chemical Bank, all were provided with a motion picture completion guaranty, i.e., an agreement to provide additional funding for a motion picture to assure timely completion and delivery of the picture. FRP Productions, Inc. ("FRP") and Film Finances Limited were the completion guarantors. On March 14, 1979, New Line entered into a distribution agreement with Columbia Pictures, a division of Columbia Pictures Industries, Inc. ("Columbia"), granting Columbia the right for a period of 15 years [7] to distribute STEEL in certain foreign countries in all media except television (other than free television in Japan, Australia and Germany). Under the agreement, Columbia would pay New Line a minimum guarantee of $ 1,600,000. Columbia would retain the first $ 6 million in *570 receipts from its distribution of the Picture, and receipts thereafter would be divided equally between Columbia and New Line. Through March of 1979, New Line also had entered into agreements with other distributors for other foreign countries under which New Line was to receive cash and letters of credit providing for the payment of at least $ 583,500 against delivery of STEEL. Mr. Glass and Somerset enter the picture
Soon after FRP and Film Finances Limited made the completion guaranties, Everett Rosenthal, the president of FRP, approached Mr. Glass regarding Mr. Glass' interest in sharing the risk on the motion picture completion guaranty. FRP had purchased a reinsurance policy on its guaranty, but that policy contained a $ 200,000 deductible amount. In exchange for a share of the completion guaranty premium received by FRP, Mr. Glass and three of his law partners then agreed to share a portion of the risk on the $ 200,000 deductible amount. Subsequently, about the time STEEL was completed or just afterwards, Mr. *571 Rosenthal informed Mr. Glass that Mr. Davis and Mr. Panzer were interested in selling the picture. Mr. Glass viewed STEEL, but did not arrange for an appraisal of the film's value because he was "intimately familiar" with the production costs of the film through his participation in the completion guaranty. Messrs. Glass, Davis, and Panzer than informally agreed that Mr. Glass would arrange to purchase STEEL, and that an umbrella distribution company would be formed as a focal point to receive all income due from subdistributors and to administer and supervise the various distribution agreements. A series of agreements was executed in furtherance of those purposes. Monday Distributing, Inc. ("Monday") was formed to serve as the umbrella distribution company. Monday was controlled by Messrs. Davis and Panzer, and both men were officers of the company. (From time to time, we hereinafter shall refer to Monday, Steel LP, Steel Productions, Inc., and Davis/Panzer Productions, Inc. collectively as "Mr. Davis' entities.") Monday and Steel LP entered into a distribution agreement, dated as of April 1, 1979 (the "Monday distribution agreement"), in which Steel LP granted to Monday the *572 right to make all decisions relating to the worldwide distribution of STEEL, including the right to determine the terms and conditions of any subdistribution agreements. The Monday distribution agreement also provided for Steel LP to pay Monday the sum of $ 425,000 for advertising and promoting Steel LP, payable $ 200,000 on May 1, 1979, and $ 225,000 on September 30, 1979. The Monday distribution agreement entitled Monday to 20 percent of the first $ 1 million, and 15 percent of the excess, of receipts from non-U.S. distribution. A direct distributor for the United States had not yet been selected for STEEL, so the Monday distribution agreement also provided that Monday would get a fee upon which the parties later would agree if Monday were the U.S. direct distributor, but that Monday would not be entitled to any fees for U.S. distribution if it were not the U.S. direct distributor. Regardless of any distribution services Monday might provide, the Monday distribution agreement provided that Monday was to be the depository for all receipts due from distributors. The agreement provided, however, that Monday was not required to remit to Steel LP any of Steel LP's share of proceeds *573 from the film until 1983. The Monday distribution agreement soon was amended to provide that Monday was not required to make remittances only during 1979 and 1980. Under the amendment, Monday would not be required to remit a sum in excess of $ 675,000 in 1981, and Monday would not be required to remit a sum in excess of $ 1 million during 1982. Any amounts due and payable, but in excess of the aforementioned sums, would be paid by Monday in 1983. As of April 1, 1979, the same effective date as the Monday distribution agreement, Steel LP and Cincoa Investors, Inc. ("Cincoa") entered into a purchase agreement (the "Steel LP/Cincoa agreement"), under which Steel LP sold [8] to Cincoa its rights in STEEL, except for (a) Any of the literary and/or dramatic material contained in the Picture or upon which the Picture is based and the copyright and any renewals and extensions thereof * * *, except to the extent necessary to allow [Cincoa] to *574 distribute the Picture throughout the world; [and] (b) Any television series rights, so-called television "special" rights, remake or sequel rights, or any other subsidiary or ancillary rights and/or allied rights (including, without limitation, theatrical stage rights) * * *. Furthermore, the agreement also stated, It is specifically understood that all other ancillary rights such as music publishing, merchandising, screenplay, novelization and the like are not to be included in the grant of rights herein and are reserved to [Steel LP] for its unrestricted use and disposition. The Steel LP/Cincoa agreement provided that the purchase price was $ 4,500,000, and was payable $ 608,000 in cash and $ 3,892,000 in a promissory note bearing 10 percent interest from April 1, 1979, until the debt was paid in full, principal and interest being payable not later than June 30, 1986. The agreement provided that the note would be a full recourse promissory note, but that any unpaid principal of the note would become nonrecourse at such time as "gross receipts" (as defined in the Monday distribution agreement) equal $ 3,000,000, and at least $ 500,000 of those gross receipts were derived *575 from theatrical distribution of STEEL in the United States. Upon entering into the Steel LP/Cincoa agreement, Cincoa immediately entered into a virtually identical purchase agreement with Somerset (the "Cincoa/Somerset agreement"), whereby Cincoa transferred the rights to Somerset that had been transferred to it by Steel LP. The only difference between Cincoa's purchase and Somerset's purchase of the rights to STEEL were that the $ 4,500,000 purchase price to Cincoa was increased so that Cincoa sold those rights to Somerset for $ 4,510,000 and that the promissory note became nonrecourse upon a different level of gross receipts. Cincoa, in effect, was a "strawman" intermediary between Steel LP and Somerset, inserted solely for the purpose of providing a $ 10,000 finder's fee to Everett Rosenthal -- the president of FRP and Cincoa who had informed Mr. Glass of the desire of Messrs. Davis and Panzer to sell rights to STEEL. The Cincoa/Somerset agreement provided for cash payments of $ 608,000, but the promissory note due to Cincoa from Somerset was in the principal amount of $ 3,902,000. Somerset's note to Cincoa was a recourse note which would become nonrecouse when gross receipts *576 equalled $ 4,000,000, at least $ 500,000 of which derived from U.S. theatrical distribution. The execution of the notes and the closing of the transactions between Steel LP/Cincoa and Cincoa/Somerset ultimately took place on July 17, 1979, and July 18, 1979, respectively. Both the Steel LP/Cincoa agreement and the Cincoa/Somerset agreement provided that the purchaser would have the exclusive entitlement to claim ITC on the purchase price and that the seller waived any right to such ITC. The terms of the agreements in effect transferred the right to the ITC on STEEL from Steel LP to Somerset. Both purchase agreements also contained a warranty by the seller that the cost of production of the film would be not less than $ 4,500,000. Subsequently, final audited production costs for STEEL were determined to be $ 4,524,978. [9]
*577 In addition to the purchase agreements, Steel LP, Cincoa, and Somerset entered into assignments of the rights and obligations relating to the Monday distribution agreement. Those assignments in essence transferred to Somerset all rights Steel LP had to receive payments from Monday or to consult with Monday regarding subdistributors. In addition, it was contemplated that STEEL receipts collected by Monday would be deposited into an account at Chemical Bank entitled "Monday Distribution, Inc. Investment Account." Messrs. Glass and Davis agreed that Arthur B. Greene, an independent New York City accountant, would act as the signatory and escrow agent to control the account. At the time Somerset acquired rights to STEEL, the minimum financial commitments for the film may be summarized as follows: NBC
$ 1,200,000 TimeLife
675,000 Columbia foreign
1,600,000 Various other foreign subdistributors
583,500 less: New Line fees for foreign
(427,525)
$ 3,630,975 From those receipts, expenses such as television "residuals" and editing costs were to be paid. (Such costs ultimately come to $ 299,375.) In addition, receipts from any additional foreign *578 sales and from all U.S. distribution would be added to the above amounts, and if the general U.S. distributor were a major distributor, an additional $ 125,000 would be receivable from TimeLife. After further negotiation between Messrs. Davis and Glass during the spring and summer of 1979, Somerset agreed to assign to Steel LP a portion of its Net Producer's Share of Gross Receipts ("NPSGR"). [10] Specifically, with respect to NPSGR from distribution in the U.S. and Canada, 50 percent of the first $ 700,000 of such receipts would be paid to Steel LP to offset the promissory notes due to Cincoa and Steel LP, [11] and Somerset was entitled to the other 50 percent. The next $ 506,896 of domestic receipts would be paid to Steel LP. Domestic receipts thereafter were to be paid 71 percent [12] to Steel LP and 29 percent to Somerset. Non-domestic receipts, at the offset, would be paid 71 percent to Steel LP and 29 percent to Somerset. At such time as the aforementioned receipts assigned to Steel LP (both domestic and foreign) were sufficient to repay the note to Steel LP and the accrued interest thereon (at 10 percent per annum from April 1, 1979), there would be a "flip" in the allocation *579 of the receipts from STEEL. The next $ 500,000 of receipts would go to Steel LP for payments to "Third Party Participants." [13] All receipts in excess of that $ 500,000 would go 13 percent to Somerset and 87 percent to the third party participants. *580 Somerset's price of admission
In addition to its two general partners, Messrs. Glass and Sharmat, Somerset had 20 limited partners. Limited partnership shares were described by reference to the number of "units" owned by a limited partner, and each of the limited partners owned from 1/2 to 3 units. The limited partners' total partnership interests aggregated to 20 units. Petitioner Harold Brown (hereinafter individually identified as petitioner) owned one unit in Somerset. Each of the general partners was responsible for a capital contribution of $ 5,000 and each limited partnership unit was responsible for a capital contribution of $ 82,500; thus, Somerset's total contributed capital was $ 1,660,000. Each limited partnership unit was entitled to 4.8 percent of the partnership's profits and losses, and the general partners were entitled to split the remaining 4 percent. The capital contributions for each unit were to be paid by the limited partners as follows: $ 35,000 cash upon entry into the partnership; a negotiable promissory note in the principal amount of $ 37,500 due March 15, 1980; and a negotiable promissory note in the principal amount of $ 10,000 due March 15, 1981. *581 The promissory notes were secured by irrevocable letters of credit. Each partner also was required to execute a Guarantee for his pro rata share of the $ 3,902,000 note due to Cincoa; thus, a guarantee in the amount of $ 187,296 (4.8% x $ 3,902,000) was required for each limited partnership unit. Petitioner purchased his one-unit interest in Somerset in such a fashion, paying $ 35,000 in cash and executing a guarantee for the amount of $ 187,296 in July 1979, and having his letters of credit in the amounts of $ 37,500 and $ 10,000 drawn against and expire on April 15, 1980 and April 15, 1981, respectively. Before investing in Somerset, petitioner and the other limited partners received a Private Placement Memorandum regarding the partnership dated April 20, 1979 ("Placement Memo"), as well as Projections of Taxable Income and Cash Flow for four years prepared by Oppenheim, Appel, Dixon & Co., Certified Public Accountants, and dated May 22, 1979 ("Projections"). The Placement Memo specifically noted that the limited partnership interests would not be registered with the Securities and Exchange Commission, and that each limited partner would be required to sign a representation *582 that acquisition of his partnership interest was not being made with any present intent to distribute, resell, or in any other way transfer or dispose of such interest. The Placement Memo noted that a majority of completed motion pictures fail to generate enough revenue from distribution to cover production and distribution costs. The Placement Memo also made the statements "No person should contemplate this investment unless he has otherwise taxable income more than sufficient to utilize the deductions anticipated," and "no investor will be accepted as a Limited Partner if there is indication that he is relying upon the financial success of the Partnership and anticipates at least a return of his investment." The Placement Memo contemplated the Somerset's contributed capital would be disbursed as follows: To Steel LP - film down payment
$ 608,000
advertising expenses
425,000
interest on note through Dec. 1979
292,000
Finance Charges for Letters of Credit
50,000
Fees to General Partners
50,000
Legal Fees - tax advice
7,500
partnership agreement
7,500
purchase and distribution agreements
20,000
Placement Memo
10,000
Accounting Fees
10,000
Selling Fees [Finders Fees re limited partners]
165,000
Organizational & Miscellaneous Expenses
10,000
Reserve
5,000
$ 1,660,000
*583 Somerset actually made payments in the following amounts during 1979: Steel LP
$   929,562.40 Somerset Advertising Account [14]
433,075    Finders' Fees
165,000    less: partial Finders Fee repayment
(6,187.50)
General Partners
75,000    Mr. Glass' law firm
75,000    Other Attorneys
17,803.01 Accountants
10,000    "Commissions" paid to Cincoa and
Somerset Advertising Account
1,332.50 $ 1,700,585.41 Even though the limited partners had been required to pay only $ 700,000 cash in 1979, Somerset was able to spend a greater sum in 1979 because it had received loans from Chemical Bank by pledging the limited partners' letters of credit as security. Additionally, in November and December of 1979, the general partners returned to Somerset $ 60,025 of the amounts earlier paid to them. The Projections were prepared "based upon assumptions and information submitted by the *584 management of Somerset." The accountants noted that the scope of their engagement was "limited to assembly of the pertinent information in accordance with the assumptions and requirements accompanying the projections," and that they expressed no opinion "as to the reasonableness, comprehensiveness or validity of the aforementioned assumptions, nor the degree of probability that projected results as presented, will be realized." The Projections were for the four-year period 1979-1982 and were calculated based upon STEEL having "Projected Gross Receipts" of $ 5 million, $ 15 million, and $ 20 million. As used in the Projections, "Projected Gross Receipts" referred to total rental receipts collected by the various subdistributors; thus, subtraction of the various distributor and subdistributor fees would be necessary before "Projected Gross Receipts" could correlate to the NPSGR used in determining the allocation of receipts between Somerset and Steel LP. The Projections summarized potential results to a 1-unit Somerset partner for the 1979-1982 period (based upon a 50 percent tax bracket), as follows: Projected Gross Receipts
$ 5 million
$ 15 million $  20 million
Cash Returned to Partner
$   16,802
$   73,809
$ 100,727 ITC and Tax Savings (Increases)
46,705
6,937
(6,521)
Gross After-Tax Benefits
63,507
80,746
94,206 Cumulative After-Tax Benefits
Invested at 5% (tax-free)
76,459
94,137
107,218 *585 The Projections, however, did not consider the partner's cash contributions to the computation of after-tax benefits of investing in Somerset. Thus, after taking the cash contributions into account, the following results would obtain for the four-year period for a 1-unit partnership interest: Projected Gross Receipts
$ 5 million
$ 15 million $ 20 million
Cash Returned to Partner
$ 16,802 $ 73,809 $ 100,727 less: Cash Invested
(82,500)
(82,500)
(82,500)
Net Cash From (To) Somerset
(65,698)
(8,691)
18,227 ITC and Tax Savings (Increases)
46,705 6,937 (6,521)
Total Benefit (Cost)
(18,993)
(1,754)
11,706 Total Benefit Invested at
5% (tax-free) [15]
($ 15,901)
1,777 14,858 *586 The Projections support the statement in the Placement Memo that in order "for the Limited Partners to recoup their total investment of $ 1,650,000 it is estimated that the Picture will have to realize gross receipts of approximately $ 15,000,000." Such a statement, however, presumed the inclusion of tax savings as part of the partners' return on investment. The plot after Somerset's entrance
STEEL was released in foreign markets on August 3, 1979. To arrange for the domestic distribution of STEEL, Monday entered into an agreement with Columbia as of August 1, 1979, granting Columbia the exclusive right to distribute STEEL in the United States and Canada. In contrast to the Columbia foreign distribution arrangement, the domestic agreement did not provide for any minimum guarantees or payments to be made by Columbia for STEEL, and Columbia had no commitment to spend any minimum amount on prints and advertising for the movie. Columbia's only commitment was that it would test market the film in at least six markets before deciding whether to undertake a general release of STEEL. After Norman Levy, a Columbia executive, left Columbia to work for 20th Century-Fox Film Corp. *587 , Columbia decided to promote STEEL in a much more limited, and less aggressive, fashion than had been contemplated originally. Columbia lived up to its minimal commitments regarding domestic distribution of STEEL; however, Monday and Columbia agreed in 1980 to terminate Columbia's domestic involvement with STEEL. On July 17, 1980, Monday entered into an agreement with World Northal Corporation ("World Northal"), granting World Northal the right to distribute STEEL domestically. World Northall, in return, agreed to spend at least $ 350,000 for prints and advertising of STEEL on or before June 1, 1981. Although World Northal had employees who were experienced in the film industry, it was not a major distributor. Consequently, the contingent $ 125,000 bonus from TimeLife was forfeited by the use of World Northal as the general domestic distributor. In exchange for its distribution services, World Northal was entitled to retain the following percentage of the receipts collected by it from theatrical film rentals of STEEL: Receipts up to $ 2,000,000
85%
$ 2,000,000 up to $ 2,500,000
75%
$ 2,500,000 up to $ 5,000,000
70%
$ 5,000,000 up to $ 10,000,000
65%
over $ 10,000,000
60%
*588 For any sums World Northal received from non-theatrical rentals relating to the movie, World Northal first would recoup any expenses incurred by it in connection with the exercise of the non-theatrical rights, and then would keep 50 percent of the remaining profits. STEEL finally was released in the United States on August 1, 1980. STEEL was a "flop" in the domestic market; gross domestic receipts totaled less than $ 300,000. The poor domestic performance in the film led to the souring of relationships among certain of the individuals and entities involved with STEEL. Monday (represented by Mr. Davis) and Somerset (represented by Mr. Glass) came to disagree because of Monday's failure to adhere to its obligation to render quarterly gross receipt statements to Somerset. In addition, gross receipts collected by Mr. Davis' entities, which were to have been deposited in the Monday/Somerset Escrow Account, were not deposited as required. On January 27, 1982, six Somerset limited partners, owning a total of 5 units among them, filed a suit against Somerset and Messrs. Glass and Sharmat in the Federal District Court for the Central District of California (the "California suit"). *589 [16] As relief, the suit prayed for the recision of the partners' interests in Somerset, as well as the return of the $ 82,500 per unit paid by the partners. The suit also prayed that consequential damages of at least $ 21,239, punitive damages of $ 200,000, costs of attorneys and of suit, and interest thereon be awarded for each partnership unit. No mention was made in the complaints of the limited partners' guarantees of the Somerset/Cincoa note. The California suit alleged violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, as well as a violation of the California Corporations Code and a charge of common law fraud. The suit alleged that the defendants had made the following false representations: (a) That a major, well respected distributor of motion pictures, Columbia Pictures Industries ("Columbia"), had made a binding commitment to distribute the motion picutre [sic] "Steel" in theatres in the United States and Canada; and (b) That Columbia had agreed to guarantee a print and advertising expenditure of $ 2,500,000.00 for this domestic market distribution and had agreed to pay the owner of "Steel" a profit interest equal to 30% of Columbia's *590 gross revenue from its domestic market distribution of the film until Columbia had received a total amount of revenue equal to 2.5 times its prints and advertising expenditures, and thereafter pay the film's owner 50% of Columbia's gross revenue. The suit further alleged that the plaintiffs would not have purchased their limited partnership units but for those alleged misrepresentations. The court ultimately entered a voluntary dismissal of the California suit without prejudice, based upon an agreement of the parties to the suit. On September 2, 1983, the parties to the California suit agreed to toll the statutes of limitation relating to the alleged claims for the period beginning January 27, 1982, and ending on the earlier of (a) six months after all named plaintiffs received written notice of payment by Somerset of the entire principal balance due on the note to Cincoa, or (b) June 30, 1990. June 30, 1990, is four years after the date the Steel LP/Cincoa and Cincoa/Somerset *591 notes are finally due and, as such, is the date on which the California statute of limitations expires on any claims to enforce the limited partners' guarantees of Somerset's promissory note. See Cal. Civ. Proc. Code sec. 337 (West 1982). On July 6, 1982, Roger T. Wilson, a Somerset limited partner owning 3 units, filed suit in the Federal District Court in Minnesota against Messrs. Glass and Sharmat, Mr. Glass' law firm, Cincoa, Steel LP, Davis/Panzer Productions, Inc. and Monday (the "Minnesota suit"). The suit alleged that Monday had breached its agreement with Somerset because Monday had not rendered quarterly reports to Somerset, and had not deposited certain receipts from STEEL into a joint Monday/Somerset account. The suit also alleged fraudulent misrepresentations and concealment, as well as violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and a Minnesota state statute, on the grounds that the general partners, in connection with the offer and sale of Somerset limited partnership units, had misrepresented or failed to disclose certain information related to Somerset and the movie STEEL. Among the misrepresentations the suit alleged to have *592 been made to Mr. Wilson was the following: An investment in Somerset was a "no brainer" -- i.e., that because of presales of the Picture an investor was assured of recovering the amount of his investment without regard to the tax benefits (except for the investment tax credit) to be generated by an investment in Somerset. In fact, such presales, together with the investment tax credit, were not sufficient to enable a limited partner in Somerset to recover the amount of his investment without taking into account the additional tax benefits generated by such investment. The Minnesota suit was unresolved as of the date of trial in the instant case. After the California and Minnesota suits were filed, Mr. Glass caused Mr. Davis, acting for Monday, to agree to an amendment of the Monday distribution agreement on March 25, 1983. In paragraph 10.3(d) of that amendment ("paragraph 10-3(d)"), Somerset, as assignee of all rights originally held by Steel LP with respect to the agreement, and Monday agreed to the following: Notwithstanding anything to the contrary contained herein, [Somerset] shall be entitled to receive with the second accounting statement furnished in 1986, as *593 part of the license fee hereunder, an amount equal to fifteen per cent (15%) per annum of the Net Producer's Share of Gross Receipts calculated from the date such monies actually are received by Licensee, but not in excess of (x) $ 3,892,000 plus interest thereon at the rate of 10% per annum from April 1, 1979 through June 30, 1986, less the aggregate of (y) an amount equal to 71% of the [NPSGR] from all sources and territories other than theatrical and nontheatrical distribution of the Picture, in the United States and Canada, plus an amount equal to (i) 50% of the first $ 700,000 of all other [NPSGR] thereof, plus (ii) 100% of the next $ 506.897 [sic] thereof, plus (iii) 71% of said receipts thereafter realized, the aggregate of the foregoing amounts set forth in (y) being calculated on a cumulative basis at June 30, 1986. Another paragraph of the amendment also altered once again the time at which Monday would be required to distribute the receipts it had collected. The amendment provided that no payments were to be made until 1983, when $ 70,000 was to be paid on or before April 29, 1983, and $ 180,000 was to be paid on June 30, 1983. Any additional amounts up to the *594 next $ 250,000 were to be paid on January 10, 1984, and NPSGR due to Somerset in excess of $ 500,000 were to be paid on January 10, 1985. On April 11, 1983, another suit relating to STEEL was filed, this one by Lee Majors and a corporation of his, Elecos Productions, Inc. ("Elecos"), against Messrs. Davis and Panzer, Davis/Panzer Productions, Inc., Steel Productions, Monday, and ten unnamed Does (the "Majors suit"). In that suit, Mr. Majors and Elecos sued for an accounting of all monies due to them with respect to Mr. Majors' partnership interest in Steel LP and to Elecos' contract to provide Mr. Majors' services as star and executive producer of STEEL. The parties to that suit subsequently came to a settlement in which the plaintiffs would receive payment of $ 235,000 in cash, as well as the assignment of all the defendants' rights and interest in the remaining monies to be paid by STEEL by TimeLife, which at that time aggregated to $ 300,000. Denouement
It is unclear exactly what Mr. Davis did with the receipts remitted by the various subdistributors and contractors for STEEL, but the funds did not flow directly into Monday accounts as originally contemplated by Somerset. *595 Certain of the STEEL receipts were used to repay Steel LP's loan from Chemical Bank, which was repayed in full in early 1980. There are indications that certain of the receipts were placed by Mr. Davis in "undisclosed accounts in England." After several months of disagreement over the proper amount of funds due Somerset, Messrs. Glass and Davis came to an agreement dated March 20, 1984. Pursuant to that agreement, Somerset executed an assignment of its share of the TimeLife funds appropriate to allow those funds to be paid directly to Lee Majors. In addition, Mr. Davis agreed that Somerset was due the sum of $ 1,021,844.19 ("the settlement sum") from Steel LP/Monday, and Mr. Davis personally guaranteed that amount. The settlement sum was composed of the following elements: NBC license of $ 1,200,000, less 10% down
payment used in financing production
$ 1,080,000   TimeLife Films -- all other TV rights
675,000   Foreign theatrical -- net after commissions [17]
1,759,236   3,514,236   Less permitted deductions (TV residuals, TV
editing costs, additional expenses)
-299,375   3,214,861   Somerset's share of NPSGR (non-domestic)
x29%  932,309.69
Plus 50% of domestic receipts
(paid as of December, 1982)
24,534.50
Plus settlement of dispute concerning
recoupment of advertising contribution [18]
65,000   $ 1,021,844.19
*596 The settlement sum does not explicitly take into account any fees for Monday's services, even though the distribution agreement apparently gives Monday a right to 20 percent/15 percent of the receipts from foreign distribution. That sum also does not explicitly take into account Somerset's right, pursuant to paragraph 10.3(d), to the 15 percent annual fee on NPSGR. Somerset also retained its entitlement to its share of any additional proceeds which might be received from World Northal for domestic distribution. The latest World Northal report contained in the record is for the period ended December 31, 1984, and shows STEEL's domestic gross receipts to date to be $ 289,443, *597 of which $ 55,906 is "Due Licensor." Somerset's share (50 percent) of that amount would be $ 27,953, or $ 3,418.50 more than the amount contemplated in the settlement with Mr. Davis. The final $ 360,000 payment from NBC was not due until the end of the telecast term, March 1986, because NBC had not, and was not planning to, run STEEL a second time. Messrs. Davis and Glass did not wish to wait until March 1986 for that payment, so they negotiated with NBC to have the payment made earlier than the due date. In exchange for prepayment by NBC, they agreed to discount the $ 360,000 due and accept $ 337,000 on the condition that NBC make payment by January 10, 1985. NBC agreed and made the final payment due for STEEL in early 1985 with the $ 23,000 discount from the original contract terms. Somerset ultimately received payments relating to STEEL as follows: 6/23/83
$  70,000
2/3/84
60,000
1/18/85
510,000
early 1986
337,998
$ 977,998
Those payments totalled approximately $ 43,846 less than the amount of the settlement sum. On April 1, 1986, Steel LP, Cincoa, and Somerset executed several agreements to effectuate a transfer of the rights to STEEL. The *598 terms of those agreements provided as follows: 1) Somerset transferred all its rights to STEEL to Steel LP, in exchange for payment to Somerset of $ 20,000. 2) Somerset assigned to Cincoa its right to receive that $ 20,000, in exchange for full discharge of Somerset's obligation to Cincoa on the promissory note used to acquire STEEL. 3) Cincoa authorized Steel LP to retain the $ 20,000 due to Somerset and assigned to Cincoa, in exchange for full discharge of Cincoa's obligation to Steel LP on its note used to acquire STEEL. In short, all of Somerset's and Cincoa's rights to STEEL were transferred to Steel LP, both promissory notes were discharged, and no money changed hands. During the years in issue, Somerset reported items of income and expense on its Federal partnership income tax returns on the cash method of accounting as follows: 1979
1980
Interest Income
-0-
$ 3,610
Guaranteed Payments to General Partners
$    89,976
-
Interest Expense
317,783
-
Depreciation
1,252,778
$ 2,171,481
Amortization
2,625
3,500
Advertising Expense
437,207
-
Miscellaneous
303
150
Net Loss
$ 2,100,672
$ 2,171,531
Somerset's partnership *599 tax returns reported gross income over subsequent years as follows: 1981
1982
1983
1984
1985
1986
Gross Receipts
-
-
$ 70,000
$ 60,000
$ 510,000
$ 339,000
Interest Income
-
$ 895
530
1,782
10,048
12,573
Section 1245 Recapture
-
-
-
-
-
3,902,000
Petitioners' 1979 and 1980 tax returns reported petitioner's share of Somerset's losses in the amounts of $ 100,833 and $ 104,233, respectively. On their 1979 return, petitioners also reported ITC from Somerset in the amount of $ 14,432 -- petitioner's share of the ITC attributable to Somerset's claimed eligible investment of $ 4,510,000 in the movie. In the notice of deficiency, respondent disallowed those losses and the ITC in their entirety. OPINION Respondent has proffered a plethora of arguments as predicates for disallowance of petitioner's losses and ITC from Somerset. We first shall focus on respondent's contention that Somerset did not acquire an ownership interest in the film. Rights in STEEL
Whether Somerset became the owner of the film for tax purposes as a result of the transactions with Steel LP is a question of fact to be determined by reference to the *600 written agreements and the attendant facts and circumstances. Durkin v. Commissioner,87 T.C. 1329, 1367 (1986), on appeal (7th Cir. February 1, 1988); Tolwinsky v. Commissioner,86 T.C. 1009, 1041 (1986); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1327 (1981); Miller v. Commissioner,68 T.C. 767, 776 (1977). The simple expedient of executing written agreements, such as the transfer of formal legal title, however, will not shift the incidence of taxation attributable to ownership of the film if the transferor continues to retain significant control over the property transferred. Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978); Tolwinsky v. Commissioner,86 T.C. at 1041; Law v. Commissioner,86 T.C. 1065, 1094 (1986). Taxation is not so much concerned with refinements of title as it is with a taxpayer's actual command over the property. Frank Lyon Co. v. United States,435 U.S. at 572; Corliss v. Bowers,281 U.S. 376, 378 (1930); *601 Tolwinsky v. Commissioner,86 T.C. at 1041. In the context of a purported sale transaction, such as that at issue herein, the issue is whether the parties have done in fact what the form of their written agreements purports to do. Falsetti v. Commissioner,85 T.C. 332, 348 (1985). This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). Petitioners have the burden of proof. Rule 142(a).
In determining whether a sale has occurred and the benefits and burdens of ownership have been transferred, we noted in Houchins v. Commissioner,79 T.C. 570, 591 (1982), that the pertinent factors to be considered are (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control *602 over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. * * * Respondent asserts that the Somerset partners did not purchase an ownership interest in STEEL because the apparent transfer of legal title, though in the form of a sale, was a sham devoid of all business purpose and economic substance. We believe that Somerset in fact did not acquire an undivided ownership interest in the film; however, we disagree with respondent's assertion that the transactions at issue were shams entirely devoid of business purpose and economic substance. The totality of facts and circumstances establishes that the transactions involving Somerset possessed economic significance beyond the anticipated tax benefits. We are satisfied that the negotiations between Mr. Glass (on behalf of Somerset) and Mr. Davis embodied the indicia of arm's-length dealings. Given the film's costs of production, we also are satisfied that the fair *603 market value of the film when it was transferred approximated the stated transfer prices ($ 4.5 million to Cincoa, $ 4.51 million to Somerset). See Siegel v. Commissioner,78 T.C. 659, 687 (1982). [19] Furthermore, we are persuaded that the contractual terms of the Monday distribution agreement bear economic significance indicative of a financial interest of Somerset in the exploitation of the film. We are convinced that Somerset, if not Mr. Davis also, intended to adhere to the terms of that agreement. What we do not believe, however, is that Somerset acquired sufficient rights in the film to be considered the owner. For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright; thus, no sale has occurred if the transferor has retained substantial proprietary rights in the motion picutre. Durkin v. Commissioner,87 T.C. at 1369; Tolwinsky v. Commissioner,86 T.C. at 1042-1043. *604 We first look at the specific terms of the transactions as reflected in the written agreements. Steel LP retained certain of the rights to STEEL when it executed the Steel LP/Cincoa agreement. [20] Specifically, Steel LP retained "any interest whatsoever" in any of the literary and dramatic material "contained in the Picture or upon which the Picture is based and the copyright and any renewals and extensions thereof," as well as certain television and other ancillary rights. Identical language also was contained in the Cincoa/Somerset agreement. The purchase agreements transferred to the respective purchasers only "the right to rent, lease, exhibit, distribute, and otherwise deal in and with respect to" STEEL. [21] The transfer of such rights, when considered together with Steel LP's retention of other rights, indicates to us that the true form of Steel LP's transfer of STEEL is that of merely a license or lease, not a sale transaction. *605 We continue our examination of Somerset's transactions by turning to the actual flows of cash between the parties involved. Somerset actually paid total cash of $ 1,362,637.40 to Steel LP in 1979, [22] and Somerset ultimately was repaid, during 1983 through 1986, $ 977,998 of its cash investment. Our calculation of the total STEEL receipts that should have been payable by the sundry distributors to Monday or any other of Mr. Davis' entities reveals that total producer's receipts were as follows: [23]
NBC
$ 1,200,000 less: prepayment discount
(23,000)
TimeLife
675,000 Foreign (from New Line)
1,759,236 less:  allowed expenses (TV costs, etc.)
(299,375)
Domestic (from World Northal)
55,906 $ 3,367,767 Thus, after all of Somerset's transactions relating to STEEL were completed, Somerset paid Steel LP *606 30.11 percent of the total audited production costs of the film and received back from Mr. Davis and his entities cash equal to 29.04 percent of the total net producer's receipts from STEEL. In short, the written agreements, in which Steel LP retained certain significant rights in STEEL and through which Somerset would receive 29 percent of net receipts from the film until "break even", when considered in conjunction with the actual economic results of the transactions, i.e., Somerset's payment of 30.11 percent of the costs of STEEL and receipt of 29.04 percent of producer's receipts from STEEL, lead us to conclude that Somerset was not the owner of the film STEEL. Rather, we hold that Somerset acquired an intangible contract right to participate in the profits from the exploitation of STEEL. [24] Our holding that Somerset acquired only an intangible contract right to profits does not preclude a finding that Somerset possessed a depreciable interest in STEEL. Indeed, Somerset's intangible contract right to a profits participation in STEEL is a depreciable interest. See Durkin v. Commissioner,87 T.C. at 1372; Tolwinsky v. Commissioner,86 T.C. at 1052-1053. *607 Both parties concede in their briefs that, upon a finding that Somerset possessed an intangible profits interest in STEEL, Somerset is entitled to depreciation under the straight line method. [25] Thus, we find that Somerset is entitled to depreciation, at least at the extent of the down payments made to Steel LP in 1979. Profit Objective
Respondent *608 also asserts that Somerset's deductions are subject to the limitations of section 183 because Somerset's activity lacked the requisite profit objective. The inquiry under section 183 turns on whether the activity was entered into with an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although a reasonable expectation of profits is not required, it must be shown that a bona fide objective of making a profit truly existed. Taube v. Commissioner,88 T.C. 464, 478-479 (1987). The determination is made at the partnership level, and our focus is on the general partners. Taube v. Commissioner,88 T.C. at 478, 480. The existence of the requisite objective is a question of fact to be determined from all the facts and circumstances. Dreicer v. Commissioner,78 T.C. at 645. We are convinced that Somerset's motion picture activity was one engaged in with the requisite profit objective. Messrs. Glass and Sharmat *609 were experienced in the negotiation of motion picture purchase and distribution agreements. Other motion picture partnerships by Messrs. Glass and Sharmat were profitable. The Projections prepared by the general partners analyzed Somerset's potential profitability at various given levels of film receipts. The fact that the Projections also set forth the expected tax benefits of owning a partnership unit does not negate the profit objective. The film starred well-known actors. Moreover, by the time Somerset acquired any rights in STEEL, pre-release NPSGR exceeded $ 3.6 million, or about 80 percent of the film's production costs. Of that $ 3.6 million, $ 1,755,975 ($ 2,183,500 before New Line distribution commissions) was from foreign distribution. We believe Mr. Glass' testimony that at the time he was contemplating the purchase of rights to STEEL, an industry rule of thumb was that foreign receipts generally would provide 40 percent of a film's total revenue, and that he projected that domestic receipts would exceed the foreign presales. If domestic receipts had at least equaled foreign presales, NPSGR would have exceeded the film's costs of production and the film would have *610 been profitable. The general partners' projection of profits also was justified because at the time Somerset entered into the transactions relating to STEEL, negotiations were under way with Columbia, a major distributor, for the domestic distribution of the film. The facts that Columbia subsequently backed away from domestic distribution and that final domestic results were unsuccessful do not obviate the profit objective of the general partners and Somerset. Consequently, although Messrs. Glass and Sharmat surely were aware of the tax implications of Somerset's investment in STEEL, we find that Somerset's activity related to its profits participation in STEEL was engaged in for profit within the meaning of section 183 and that the limitations of that section do not apply herein. [26]
Promissory Note
We also must decide the appropriate depreciable basis for Somerset's contract right. Petitioners *611 assert that the Somerset/Cincoa note, which was guaranteed by all the limited partners, was a recourse note as to the limited partners,and as such should be included in the depreciable basis. Respondent maintains that the note was not truly a recourse liability and that the limited partners in substance were not liable for the amounts of their guarantees. Unless a debt is bona fide, it does not reflect an investment in property and cannot be included in a taxpayer's depreciable basis. Estate of Franklin v. Commissioner,544 F.2d 1045, 1047 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Tolwinsky v. Commissioner,86 T.C. at 1056. Respondent introduces his discussion of the bona fides of the note by citing the axiom "If it looks like a duck and walks like a duck and talks like a duck, it must be a duck! Salute it!" Respondent contends that we should reject such logic and not "salute the note" as a recourse note merely because the provisions of both the note and the limited partners' guarantees cause the note to appear to be recourse. Respondent *612 cites three items of evidence to support his contention that the note should not be recognized as a bona fide recourse debt. He first cites the testimony of Roger Wilson, the plaintiff in the Minnesota suit. In light of the fact that Mr. Wilson's suit againt Messrs. Glass and Sharmat and Mr. Davis' entities still was unresolved as of the date of trial in the instant case, we discount Mr. Wilson's testimony as being biased, and put little reliance in it. Respondent's next item, however is well taken. Respondent points to the facts surrounding the California suit as evidence of the note's lack of substance. The terms of the settlement of that suit were such that the statutes of limitations on the plaintiff partners' claims against Messrs. Glass and Sharmat were tolled until the later of six months after Somerset paid the entire Cincoa note or the expiration of the statute of limitations for collecting from the limited partners on their guarantee of Somerset's note. We find it curious, however, that in their complaints filed in the California suit, the Somerset partners failed to ask for abatement of their liabilities on their note guarantees, but did ask for the return of all *613 funds already paid by them to Somerset. Such a failure might be merely an oversight on the part of them or their attorneys. There is another view that could be taken, though, which would provide a likely explanation for that failure. Specifically, the partners might have believed that their "guarantees" were illusory and did not truly represent any potential liability, and nothing had transpired in the two and a half years since their entry into the partnership to indicate to them that they should have any worry about liability on the guarantees. [27] Continuing the scenario, it appears that after the California suit was filed, Mr. Glass must have asserted that the potential liability on the guarantees was legitimate, and the plaintiff partners only agreed to the dismissal of the California suit after the amendment of the distribution agreement (i.e., the more favorable (to Somerset) terms of paragraph 10.2(d)) and after retaining the right to pursue the claim against Messrs. Glass and Sharmat if any attempt were made to collect on their guarantees. *614 The third item of evidence cited by respondent as an indication of the true nature of Somerset's note is paragraph 10.3(d) of the amended Monday distribution agreement. Respondent asserts that paragraph 10.3(d) effectively made the note nonrecourse. According to respondent, the 15 percent fee due under paragraph 10.3(d) would offset any obligation of Somerset on the purchase note. Respondent's assertion finds support in the testimony of Richard Robinson, an attorney who represented Lee Majors in matters relating to STEEL, including the Majors suit. Mr. Robinson stated that his impression of paragraph 10.3(d) was that it created "an offsetting obligation of Monday that would essentially wash out any obligation of the tax shelter group [i.e., Somerset] to pay on the note," and that he had been told that the "change was to protect the tax shelter group and they asked for it." He also testified that his understanding was "that amendment was to deal with the recourse note, and if not for the amendment with this 15 percent interest fee, the recourse note would be there and the tax shelter group would be worried about having to pay it." To refresh his recollection about paragraph *615 10.3(d), Mr. Robinson used notes made by him at the times of his conversations with Mr. Davis' attorneys and Mr. Rosenkrantz, and we find his testimony credible. Further, we shall attempt to quantify the effects of paragraph 10.3(d), focusing our inquiries on the effects of paragraph 10.3(d) as of April 1, 1986, because that was the date at which Somerset relinquished all rights in STEEL to Steel LP. Our distillation of the record leads us to conclude that producer's receipts for STEEL were paid to Mr. Davis' entities or assignees of those entities as follows: Payor
By 1979
1980
1981
1982
1984
1985
NBC (net of)
expenses)
$  120,000
-0- -0- $ 420,625
-0-  $ 337,000
TimeLife
325,000
$  50,000
-0- -0-  -0-  -0- New Line
1,052,038
707,198
-0- -0-  -0-  -0- World Northal
-0-   -0- $ 37,623
11,446
$ 6,837
-0- The terms of paragraph 10.3(d) provide for a 15 percent annual accrual on NPSGR from the time Monday receives the monies. Paragraph 10.3(d) makes no mention that the accrual period is to begin only upon its execution, and we compute an approximation of that 15 percent fee *616 using a beginning accrual date of January 1, 1980. Using an annual compounding period, our interpretation of paragraph 10.3(d) results in the 15 percent fee being approximately $ 3.5 million as of April 1, 1986. [28]
Paragraph 10.3(d) contained a cap on the amount of the 15 percent accrual due to Somerset, which cap was $ 3,892,000, plus accrued interest thereon, less the share of NPSGR assigned to Steel LP. Paragraph 10.3(d) makes no mention of the promissory notes owed by Cincoa to Steel LP or by Somerset to Cincoa; however, the $ 3,892,,000 on which interest accrues for calculation of the cap equals the principal amount of the Steel LP/Cincoa note. The parties have not provided us with any computation of the amount of the cap, or for that matter of the amount owed on the notes either by Somerset to Cincoa or by Cincoa to Steel LP. We nevertheless shall make our own calculations of what the balance of the note owed to Steel LP would have been as of April 1, 1986. Presuming *617 that Steel LP's assigned shares of NPSGR are applied against the note as the receipts were paid (because Mr. Davis' entities had the use of the funds instead of depositing them into any Escrow Account) and not applying as a paydown any part of the $ 300,000 payable by TimeLife (because it was not yet payable to Monday or its assignee, Lee Majors), we calculate that the balance due to Steel LP on its purchase note as of April 1, 1986, was approximately $ 3.43 million. [29]
*618 We read the language of paragraph 10.3(d) relating to the cap to differ slightly from the provisions of the note. Although Messrs. Glass and Davis might not have intended that the amount of the cap differ from the loan balance, we read paragraph 10.3(d) to determine the cap by computing interest on the full $ 3,892,000 for the full period from April 1, 1979 through June 30, 1986, with no offset for payments of interest or prepayments of principal through Steel LP's share of NPSGR. Steel LP's share of NPSGR would be subtracted only "on a cumulative basis at June 30, 1986." We interpret that language to mean that interest would accrue on the $ 3,892,000 in full, with no reduction in the accruing of interest to reflect receipt of NPSGR. Thus, we compute that as of April 1, 1986, the amount of the cap was approximately $ 5.2 million, [30] so the cap should not have come into play to reduce the approximate $ 3.5 million owed by Mr. Davis' entity, Monday, to Somerset pursuant to the terms of paragraph 10.3(d). *619 The $ 3.5 million apparently owed to Somerset pursuant to paragraph 10.3(d) is approximately $ 70,000 greater than the $ 3.43 million we calculated as the balance on the note due to Steel LP. Thus, respondent's contention appears to be true, in that (based upon our calculations) paragraph 10.3(d) effectively offsets any liability on the note due Steel LP. Given the interrelationships among Cincoa/Mr. Rosenthal, Mr. Davis' entities, and Somerset, we have no doubt that Cincoa would not have enforced its note from Somerset unless Steel LP first had attempted to collect on its note from Cincoa. Furthermore, we are confident that Messrs. Glass and Rosenkrantz, as well as Mr. Davis, were quite aware of what the effects of paragraph 10.3(d) would be when they amended the Monday distribution agreement to add that provision. By the date of the amendment, March 25, 1983, it was already known that STEEL was a domestic theatrical failure, and the timing and amount of any significant amounts of producer's receipts that thereafter might be received were known with reasonable certainty. Those facts cause us to question why Mr. Davis would agree to paragraph 10.3(d) when the documents theretofore *620 in effect, specifically the promissory notes and partners' guarantees, on their face provided Mr. Davis with financial protection against a significant portion of the loss on STEEL. Petitioners argue that Mr. Davis agreed to paragraph 10.3(d) in order to compensate Somerset for its lost income from Mr. Davis' failure to deposit receipts from STEEL into a Monday Escrow Account. We are not persuaded by that argument, however because any lost income to Somerset would not have been so great as the $ 3.5 million provided by paragraph 10.3(d). [31] We think it unlikely that Peter Davis, given his background and experience, would have agreed to an amendment having such terms as paragraph 10.3(d) if he merely intended to compensate Somerset for the lost income on NPSGR. Rather, it appears that paragraph 10.3(d) was a reaction by Messrs. Glass and Davis to the Minnesota and California suits. The limited partners, who originally must not have believed they were liable personally on their guarantees, [32] could have become worried that they might be called to perform on the guarantees. Paragraph 10.3(d) appears to be an avenue by which Messrs. Glass and Davis could allay the limited partners' *621 fears of actual liability on the guarantees, and preserve the limited partners' original belief regarding their liability (i.e., none). The notes and guarantees appear to be documents designed (by Mr. Glass and other attorneys who were experts in tax and entertainment law) only to produce the appearance of risk within the meaning of section 465. Although we may not be certain about such a scenario, petitioners have the burden of proof, and we find that they have not carried their burden of showing that the Somerset note in substance was a bona fide liability which every was expected to be paid by the parties to the note. Rule 142(a). Accordingly, we find that the amount of the note is not includable in Somerset's depreciable basis. Tolwinsky v. Commissioner,86 T.C. at 1056. *622 Because petitioners have not proved that the note is a bona fide liability, the payments in 1979 to Steel LP designated as interest are not properly deductible as interest. Estate of Franklin v. Commissioner,544 F.2d at 1049. Rather, we find that those payments must be included as part of the cost of Somerset's depreciable rights in STEEL. Respondent has conceded, however, that interest payments by Somerset for its short-term loans from Chemical Bank are properly deductible. Other expenses
Respondent asserts that Somerset's claimed expenses for advertising, guaranteed payments to general partners, organization costs, and miscellaneous items are not properly deductible. Respondent has stipulated that such amounts have been substantiated satisfactorily. Respondent argues, however, that such expenses were not ordinary and necessary business expenses. Petitioners bear the burden of proof. Rule 142(a). There is no evidence of the purpose for which the amounts paid into the Somerset Advertising Account were used. The only evidence supporting the advertising deduction is the Monday distribution agreement, through which Monday was entitled to receive *623 $ 425,000 "for advertising and promoting the picture." That alone is insufficient to convince us that such payments were used for advertising. The record contains a letter from Mr. Davis to Mr. Glass discussing the dispute over inclusion of the advertising payments in NPSGR which states as follows: You and I both know that the cash portion of the transaction was $ 1,325,000. How you allocated the $ 1,325,000 between the cash portion of the purchase price and the payment for advertising promotional services (with a view towards maximizing the tax benefits by increasing the current deductibility features) was left totally in your control. That paragraph indicates to us that Mr. Davis may not have viewed the funds from the Advertising Account as necessarily being earmarked for advertising and promotion. Petitioners suggest that respondent should have called Mr. Davis to testify about the funds if respondent wanted to question whether the funds truly were used for advertising; however, it is not respondent's burden to show that the funds were so used. The notice of deficiency stated, "It has not been established that partnership expenses have been incurred,or, if incurred, were *624 ordinary and necessary expenses." That statement certainly puts into issue the deductibility of all claimed expenses, including advertising, and petitioners have the burden of disproving respondent's determination. Rule 142(a). The normal inference is that testimony of an absent witness, such as Mr. Davis, would be unfavorable to the party with the burden of proof. Blum v. Commissioner,59 T.C. 436, 440 (1972); Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1168). We therefore find that petitioners have not met their burden of proving that the payments to the Advertising Account were for ordinary and necessary business expenses deductible in 1979. Insofar as we can tell, the "advertising" payments to Steel LP were simply an additional cost of the rights in STEEL acquired by Somerset, and we hold that those payments must be capitalized and depreciated as a cost of acquiring those intangible contract rights. Somerset claimed a deduction in the amount of $ 89,976 for guaranteed payments to the general partners in 1979. Entitlement to such a deduction is subject to the requirements of section 162 *625 and the provisions of section 263.[33]Sec. 1.707-1(c), Income Tax Regs.; Estate of Boyd v. Commissioner,76 T.C. 646, 660 (1981). In determining whether the payments to the general partners are deductible under section 162, we look to the nature of the services performed rather than to the partnership's designation of the payments. Estate of Boyd v. Commissioner, supra at 657-658; Cagle v. Commissioner,63 T.C. 86, 96 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Payments attributable to organization costs or syndication expenses must be capitalized. Sec. 709(a). Section 709(b) permits an election to amortize organizational costs over a 60-month period, but syndication costs, i.e., costs of selling or promoting the sale of a partnership interest, are not amortizable. Sec. 709; Estate of Thomas v. Commissioner,84 T.C. 412, 441-444 (1985). Petitioners bear the burden of proving the proper allocation between nondeductible capital payments and deductible expenses, and such allocation *626 reasonably must comport with the values of the services performed. Wildman v. Commissioner,78 T.C. 943, 958 (1982). Somerset's deduction for guaranteed payments was based on the net of $ 75,000 paid to Mr. Glass' law firm, $ 75,000 paid to or on behalf of Mr. Sharmat, and $ 60,025 repaid to Somerset during the later part of 1979 by Messrs. Glass and Sharmat. [34] Petitioners assert that the payments to the general partners were for the management of Somerset's business, including supervision of the initial distribution of the film and negotiation in connection with domestic distribution rights. We agree that the general partners, or at least Mr. Glass and his law firm, performed some management services for Somerset. We are also confident, however, that other services of the general partners were devoted towards the sale and promotion of limited partnership units in Somerset. *627 Thus, we find that Somerset is entitled to a deduction of $ 22,500 of the payments to general partners and that the remainder of the payments must be capitalized as syndication costs. [35] See Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). Somerset also took deductions in 1979 and 1980 relating to 60-month amortization of $ 17,500 of organizational expenses. Petitioners argue that because Somerset capitalized $ 168,812 as syndication costs, [36] the $ 17,500 amortizable basis is a reasonable cost of organization in light of all the services performed by the general *628 partners. The simple fact that some costs were capitalized as syndication costs, however, is no evidence at all that $ 17,500 was spent for purposes of organization. Rather, we note that Somerset paid the law firm of Arnold & Porter $ 17,803.01 in September, 1979, and that the work papers of Somerset's accountants allocated that sum $ 17,500 to "Legal & Accounting" and $ 303.01 to "Miscellaneous." Arnold & Porter issued an opinion letter dated June 6, 1979, with a supplement dated July 5, 1979, with respect to the Federal income tax consequences to Somerset of the transactions relating to STEEL, and we are confident that the September payment to Arnold & Porter was made for that opinion letter. The evidence indicate to us that $ 17,500 was the fee for Arnold & Porter's legal services and that $ 303.01 was for out-of-pocket expenses, such as photocopying or transportation. The parties make no mention of the fact, but we note that the cost of Arnold & Porter's legal services is exactly the same as the basis on which Somerset deducted organization costs, and it appears to us that Somerset claimed those Arnold & Porter services as the amortizable costs of organization. We will not *629 infer that the tax opinion letter could have been a cost of organization. Instead, we are confident that the purpose of the letter was for convincing and comforting investors in connection with the marketing of limited partnership units. Such a purpose is one of syndication, not organization. We therefore hold that Somerset is not entitled to take any deduction for amortization of organization expenses. Rule 142(a). The $ 303 deducted as miscellaneous costs on Somerset's 1979 return appears to be the costs of out-of-pocket expenses relating to the Arnold & Porter opinion letter and as such are capitalizable syndication costs. Somerset therefore is not entitled to that deduction. Somerset also deducted $ 150 on its 1980 return as expenses of bank charges. Such fees are ordinary and necessary expenses, and we hold that Somerset is entitled to a deduction therefor. Investment Credit
We next address Somerset's entitlement to ITC based *630 upon its investment in the film. A taxpayer is entitled to ITC under section 38 with respect to a motion picture film only if such film is "new section 38 property" (determined without regard to useful life) which is a "qualified film," and ITC is limited to the extent that the taxpayer has an "ownership interest" in such film. Sec. 48(k)(1)(A). Respondent stipulates that STEEL was placed in service in August 1979, and he has not suggested that STEEL is not "new section 38 property" or that STEEL is not a "qualified film." What respondent contests, however, is whether Somerset had any "ownership interest" in STEEL. A taxpayer may have an "ownership interest" in a motion picture for purposes of ITC even if the taxpayer has neither legal title to nor a depreciable interest in the motion picture. Section 48(k)(1)(C) provides that a taxpayer's "ownership interest" in a qualified film "shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production *631 costs of such film." The existence and extent of an ownership interest is determined at the time the film is placed in service. Sec. 1.48-8(a)(4)(ii), Income Tax Regs. In enacting section 48(k), Congress recognized that more than one taxpayer may be at the risk of loss with respect to the production costs of a film, and it authorized the Secretary of the Treasury to establish procedures for determining who is entitled to the credit or to a partial credit in such cases. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 230. Under section 1.48-8(a)(4)(iii), Income Tax Regs., a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is regarded as having an ownership interest for purposes of ITC if such a taxpayer "can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." In Law v. Commissioner,86 T.C. at 1111, we stated that the "thrust of section 1.48-8(a)(4)(iii), Income Tax Regs. *632 , is to allow an investment tax credit to persons with an equity-like interest in the film, even if the interest does not amount to ownership or a depreciable interest, but to disallow it to pure creditors, such as commercial lenders." A "lender" under section 1.48-8(a)(4)(iii), Income Tax Regs., may be a person who has an open-ended financial interest in the exploitation of a film. Law v. Commissioner,86 T.C. at 1111-1112. See also sec. 1.48-8(a)(4)(iii), Income Tax Regs.
Prior to the time STEEL was placed in service, Somerset and Steel LP had finalized their agreement regarding Somerset's participation in the gross receipts from the distribution of the film. Steel LP reduced its risk or investment in the production costs of the film to the extent of $ 1,362,637.40, [37] the total amount actually paid by Somerset to Mr. Davis' entities in 1979. Somerset, on the other hand, was at risk as to the production costs of the film in the amount of those payments, because it could look for repayment of such amount "solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Compare *633 Tolwinsky v. Commissioner,86 T.C. at 1064-1065, with Durkin v. Commissioner, supra, and Law v. Commissioner,86 T.C. at 1110. Somerset therefore was a "lender or guarantor" within the meaning of the regulations since it relied solely upon exhibition or disposition of the film for repayments. Consequently, Somerset's interest in the participation of the gross receipts of STEEL was an ownership interest for purposes of section 48(k)(1), and we find that Somerset and its partners are entitled to ITC on the film based on Somerset's investment of $ 1,362,637.40. Increased Interest
We last turn to whether petitioners are liable for increased interest pursuant to section 6621(c). Respondent bears the burden of proof on the applicability of section 6621(c) because he asserted it only in his amended answer. Rule 142(a); Parker v. Commissioner,86 T.C. 547, 566 (1986). *634 Section 6621(c) provides for increased interest for any substantial underpayment (i.e., in excess of $ 1,000) of taxes attributable to one or more tax motivated transactions. Section 6621(c)(3)(A) defines the term "tax motivated transaction" to include "any valuation overstatement (within the meaning of section 6659); "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period;" and "any sham or fraudulent transaction." Treasury has promulgated regulations which provide that an accounting method results in a substantial distortion of income, and thus is a tax motivated transaction, where a deduction is "disallowed for any period under section 709, relating to organization or syndication expenses of a partnership." Sec. 301.6621-2T, A-3(4), Temporary Proced. & Admin. Regs., T.D. 7998, 1985-1 C.B. 368, 499 Fed. Reg. 50391 (Dec. 28, 1984). We must determine which of the deductions and credits claimed by petitioners, if any, are attributable to tax motivated transactions. *635 We disallowed deductions for guaranteed payments to partners, amortization of organization costs, and miscellaneous expenses on the basis that the costs were capitalizable pursuant to section 709. The temporary regulations provide that a transaction resulting in any deduction disallowed under section 709 constitutes the use of an accounting method which may result in a substantial distortion of income within the meaning of section 6621(c)(3)(A)(iv), and therefore, is a tax motivated transaction. We are satisfied that the deductions which we disallowed for guaranteed payments to partners and for payments to Arnold & Porter were the result of an accounting method which distorted income, and we find that the portion of the underpayment attributable to those deductions is attributable to a tax motivated transaction. Respondent has now shown that the other adjustments to petitioners' taxes come within the purview of section 6621(c). The parties shall compute whether the underpayment attributable to the tax motivated transaction exceeds $ 1,000, so as to invoke increased interest pursuant to section 6621(c), in their Rule 155 computations. To reflect the foregoing, Decision will *636 be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. We note, for the record, our dissatisfaction with the parties' presentation of the exhibits in this case. The stipulations of facts submitted by the parties in substance are no more than a numerical recitation of the documents submitted into evidence. The record consists of several boxes holding the more than 600 documents submitted as evidence. The sheer volume of documents by itself would be of no concern to us; however, it is the presentation of those documents that causes us to comment. The documents have not been organized in any significant fashion, whether by subject or chronology, and the parties declined to follow through on our suggestion at trial that they prepare an index or other guide to assist us in our review of the exhibits. Moreover, a significant number of documents were duplicates of other exhibits, fully one-third of our admittedly unscientific estimate. The poor presentation of the exhibits, the failure of the parties to enter into any meaningful stipulation, and the general omission of citations to the record in the parties' arguments on brief goes beyond the pale and are what cause us to register our dissatisfaction.↩
3. The term "Net Profits" was defined as "Gross Receipts less repayment of Limited Partners Capital Contributions, General Partners Capital Contributions, and payment of all Costs of Production, Deferments, Distributions Expenses, Other Expenses, and [a loan from Chemical Bank]." The term "Gross Receipts" was defined as "all monies received by the Partnership net of any and all Distribution expenses, in connection with the distribution, exploitation and otherwise turning to account of the Motion Picture and any rights therein." ↩
4. Corporations named "New Line International, Inc." and "New Line International Releasing, Inc." also entered into agreements relating to STEEL, and the record refers to a "New Line Cinema Corporation." Inasmuch as Robert Shaye is listed as president of all the New Line entities, Mr. Shaye was the New Line representative in all transactions relating to STEEL, and all New Line companies appear to be related, we shall refer to all those companies as "New Line."↩
5. We have attempted to present our findings in chronological order, but have deviated from such a presentation when it makes our findings easier to understand. In the instant case, there are indications that Steel LP made agreements with respect to STEEL before Steel LP was formed under California law. Nevertheless, because many of the agreements in evidence are dated "as of" certain dates, it is impossible for us to discern the exact order in which those agreements were executed.↩
6. It is unclear from the agreement whether Steel LP would be required to repay TimeLife any part of the $ 450,000 advance if Steel LP's share of gross receipts from free television were less than $ 450,000.↩
7. The discrepancy between the 15-year term of that agreement and the 10-year term of the agreement between Steel LP and New Line is not explained.↩
8. We use such terms as "purchase," "sale," "price," and "principal" for convenience and to reflect the wording of the documents. Our use of such terms is not intended to be determinative of the legal effect of the transactions involved.↩
9. The record contains copies of three letters from Robert L. Manger of Sanford Goldstein & Company, Certified Public Accountants. One letter, dated May 12, 1982, states that production costs for STEEL were $ 4,174,768. The other letters, dated March 12, 1980, and March 17, 1983, have attached itemizations of the production costs, and show those costs to total $ 4,524,978. No such itemization was attached to the 1982 letter. The parties do not explain fully the discrepancy between the two amounts; however, by virtue of the agreement of the 1983 letter with the 1980 letter, and because the 1982 letter in evidence contains no supporting schedule, we reject the same amount in the 1982 letter, and find in accordance with the costs set forth in the other two letters.↩
10. The various documents relating to the transactions which use the term "NPSGR" refer to the Monday distribution agreement for a definition of NPSGR. NPSGR essentially was equal to the receipts from STEEL remitted to Monday by distributors after subtracting their commissions, less any fees to which Monday was entitled (i.e., 20%/15% of non-U.S. proceeds in the event Monday was not the U.S. direct distributor). All NPSGR were payable by Monday to the producer, i.e., Somerset via Steel LP's assignment of its rights under the Monday distribution agreement. ↩
11. The contemplation of the parties was that the assigned portion of receipts in form was used by Somerset to pay the Cincoa note and then paid immediately by Cincoa against its note to Steel LP, so that any receipts attributable to note payments in substance would go directly to Steel LP. ↩
12. Certain of the exhibits in the record refer to this percentage as 71.1 percent, and not 71 percent. The difference between the two is unexplained, but in any event is immaterial to our decision. ↩
13. The Third Party Participants in the profits were listed as Steel Productions, Jennifer O'Neill, Steven Carter, Lee Majors, Davis/Panzer Productions, Inc., and New Line.↩
14. Once placed in this account, payments were under the control of Mr. Davis' entities. The payments were made pursuant to the provisions of the Monday distribution agreement requiring payments for advertising and promotion of STEEL.↩
15. In determining cumulative benefits, the Projections applied an annual after-tax simple rate of return of five percent to the annual benefits, but computation of the benefits attributable to that time value of money omitted consideration of the actual cash contribution by the partner ($ 82,500 for a 1-unit share). The above recalculation of the projected total benefit takes into account the partner's cash contributions, but otherwise calculates the cumulative benefits and applies the five percent rate of return using the same method as do the Projections.↩
16. Petitioner and an eighth partner originally were included as named plaintiffs in the suit, but the First Amended Complaint in the suit excluded petitioner and the eighth partner as parties.↩
17. This licensor's share of receipts would correspond to total foreign receipts through New Line of $ 2,187,336 (75 percent of first $ 1 million and 85 percent of additional $ 1,187,336), or $ 587,336 from the various foreign distributors plus $ 1,600,000 from Columbia. ↩
18. The dispute regarding advertising centered on whether the advertising payments due under the Monday distribution agreement (see supra↩ n. 14) was includable in NPSGR for purposes of calculating the funds due Somerset from Monday.
19. See also Schwartz v. Commissioner,T.C. Memo. 1987-381↩.
20. We focus on Cincoa's purchase because Somerset's rights are derivative of Cincoa's, and Somerset can have no more of an interest in the film than was granted to Cincoa. ↩
21. None of the amendments and agreements subsequent to the original purchase agreements increased the bundle of rights in STEEL relinquished by Steel LP.↩
22. $ 929,562.40 directly, and $ 433,075 by way of the "Somerset Advertising Account." ↩
23. Although Somerset's payments through the Somerset Advertising Account might have been includable in the parties' measure of NPSGR, we omit inclusion of those payments above because they were not received on account of distribution of the film.↩
24. Such a holding is in accord with the holdings in Schwartz v. Commissioner,T.C. Memo. 1987-381 n. 25; Isenberg v. Commissioner,T.C. Memo. 1987-269; and Vandenhoff v. Commissioner,T.C. Memo. 1987-116 -- other cases involving motion picture transactions in which Mr. Glass, Mr. Sharmat, or both were involved. But see Evans v. Commissioner,T.C. Memo. 1988-468; Jacobson v. Commissioner,T.C. Memo. 1988-341↩, cases with different facts, but involving other film partnerships in which Mr. Glass was a general partner. 25. Because respondent has not addressed the issue, we take him to have conceded that the 3-year life used in Somerset's tax returns is the proper useful life over which to depreciate the partnership's rights in STEEL.↩
26. We do not address respondent's arguments in reliance on Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987), because our holdings herein would not be altered significantly by the use of the type of analysis undertaken in Rose.↩
27. Although we generally are disregarding Mr. Wilson's testimony, such an explanation also is supported by his testimony. Mr. Wilson testified that he never believed he would have to pay on the note because he was told that he had no risk on his Somerset investment: "I had no risk on anything. I had no risk on a note, I had no risk on the investment * * *."↩
28. Those amounts would have accrued approximately as follows: ↩
1980
$ 323,000
1981
389,000
1982
467,000
1983
586,000
1984
674,000
1985
825,000
1986
237,000
$ 3,501,000
29. Our computation of the approximate balance on the note due to Steel LP was as follows [1/1/86 balance ($ 3,348,022), plus interest for first quarter of 1986 (83,701) = $ 3.43 million]: Steel LP Share of
Jan 1 balance
NPSGR collected
Interest Accrued
1979
$ 3,892,000
$ 1,062,897 *   1980
2,829,103
537,611
$ 229,149
1981
2,520,641
18,811
251,123
1982
2,752,953
304,367
267,543
1983
2,716,129
-0- 271,613
1984
2,987,742
3,419
298,603
1985
3,282,926
239,270
304,366
1986
3,348,022
-0- 83,701
* Somerset made payments to Steel LP in 1979 of $ 321,562.40 in excess of the required down payments, and reported $ 317,783, the net of those Steel LP payments, interest payments to Chemical Bank, and interest income, as interest expense on its 1979 tax return. We thus assume that the entire interest obligations for 1979 were paid in that year.↩
30. $ 7,584,407 ($ 3,892,000 x (1.10) <7> [10% interest for the seven year period 4/1/79 to 4/1/86]), less $ 2,379,374, Steel LP's share of NPSGR (71% x [1,177,000 (NBC) -- 299,375 (Expenses) + 675,000 (TimeLife) + $ 1,759,236 (New Line)] + 500% x 55,906 (World Northal)).↩
31. Assuming that investment of the receipts would have generated a return of 15 percent (the rate used in paragraph 10.3(d)), accrued income on total NPSGR as of March 1983 would have been no more than $ 1.5 million. See note 28, supra.↩
32. The failure to petitioner, or any other limited partner for that matter, to testify as to any belief that he truly was liable could be construed as support for this supposition. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 573↩ (10th Cir. 1947).
33. Section 263(a)↩ generally provides that a payment for a capital asset is not deductible currently, even though it otherwise might be considered an ordinary and necessary business expense.
34. The $ 1 difference between the net of these three sums and the $ 89,976 claimed as the deduction is due to rounding and is immaterial. ↩
35. Mr. Glass, through is law firm, received $ 75,000 from Somerset in 1979 and repaid $ 30,000 to the partnership in December 1979. The net of $ 45,000 was included as part of the guaranteed payments deduction on Somerset's tax return, and we allow Somerset a deduction for 50 percent of the $ 45,000. We have seen no indication that Mr. Sharmat performed significant management services, so we allow no part of the payments to him as current deductions.↩
36. Of that amount, $ 158,812 was for finders fees paid as commissions to individuals who put future limited partners into contact with Messrs. Glass and Sharmat, and $ 10,000 was paid to the accountants who prepared the Projections.↩
37. $ 929,562.40 paid directly to Steel LP (denominated by Somerset as down payment and 1979 interest), plus $ 433,075 paid to the Somerset Advertising Account.↩